## Boyd *et al. versus* Wilson *et al.*

A sale by sample, in the absence of fraud or circumstances to indicate that the sample was to be taken as a standard of quality, is not an implied warranty of the quality of the goods sold. The sample under such circumstances becomes a guarantee only that the articles to be delivered shall follow its kind, and be simply merchantable.

January 24th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS, J., absent.

Error to the Court of Common Pleas, No. 4, of *Philadelphia county :* Of January Term 1876, No. 260.

Assumpsit by Samuel, Daniel and James Boyd, trading as Samuel Boyd & Co., against O. Howard Wilson and James Stewart, Jr., trading as Wilson & Stewart, on a promissory note of defendants to the order of plaintiffs for $2720, payable three months after date.

Defendants pleaded non-assumpserunt, payment with leave, &c.

At the trial, on the 25th of February 1876, the following were the material facts disclosed :—

On the 24th of December 1874, Henry F. Neiman, a merchandise broker, who was commissioned by the plaintiffs to sell a lot of 850 cases of canned corn, "King's brand," called upon the defendants for the purpose of effecting a sale, and exhibited to them a can of corn. Defendants requested two more cans to take home and try, and two cans were furnished them, which, after trial, they pronounced " good, sweet, white corn, sound in every respect." The defendants then offered $1.60 per dozen for the whole lot, in a note in ninety days, which the plaintiffs accepted. The defendants received the first delivery of corn on the 29th of December 1874, and other portions of it at different times until they had received 768 cases. In January the firm commenced to sell the corn to the trade, and shortly thereafter it began to be returned to them with complaints about its quality, when it was discovered that some of

[Boyd *v.* Wilson.]

the corn was not like the sample, and the sale of it was stopped in consequence. Several parties had returned the corn, and when opened some cans corresponded with the sample while others were bad, and when cooked the corn was found to be sour, greasy and unfit for food. The defendants complained about the quality of the corn, and asked the plaintiffs to take back the balance remaining on hand, which they refused to do. All but 82 cases of the original 850 had been delivered to defendants, and this balance, after the protest of the note, plaintiffs forwarded to defendants, but they declined to receive it. It appeared that "King's" brand of corn was not the best in the market and did not command so high a price as some other brands. It was in evidence, also, that there is no indication or test whereby bad corn can be detected other than by the cans being swollen by fermentation, and it was not shown that these were.

Samuel Boyd, one of the defendants, testified, "the broker said all the bad corn was to be taken back and the money returned," but the broker himself testified, "I did not say to defendants all the bad corn was to be taken back and the money refunded; there was no representation or guarantee as to the corn. I told defendants if there were any swelled cans they could be made good; aside from that I made no representation or statement. * * * I am certain I did not say that if there was any *bad* corn it would be made good, because I never use that expression; I always say 'swelled heads will be made good.'" There was no other evidence of fraud or warranty. It was attempted to be, but not satisfactorily, shown that it was the custom of the trade to return defective corn and to have the money refunded.

The following are portions of the charge of the court (Briggs, J.) to the jury :—

"[I do not see in the case anywhere any evidence of warranty as to quality, or any evidence as to fraud on the part of the plaintiffs. I say I do not perceive any evidence anywhere in the case that would justify me in submitting those propositions, viz. : of warranty or fraud to you.] I do not discover any evidence of warranty, or any evidence of fraud, unless the proposition as contended for by Mr. White be correct, that the goods being sold by sample, amounts in itself to warranty. With regard to that, in order that the case may be put squarely and fairly, so as to protect the rights of both parties—and I have got to meet the question emphatically on the one side or the other—[I say to you that sale by sample is not a warranty.] Now, I cannot put it more squarely or more fairly than that. I will give you the reason that has led me to the conclusion that I have just enunciated, and I will take as the best and most fitting illustration the very case that we have before us. There are eight hundred and more cases of corn, sealed beyond the power of human vision to determine the quality of the contents of the cans, except the heads be bulged by fermentation of gas, or bursted

[Boyd v. Wilson.]

by swelling. A broker approaches a dealer and announces the fact that he has these eight hundred cases of corn for sale. The dealer says, "Give me a can." It is brought; it is opened; it proves to be good. The dealer says, "Send me two others, one that I may take home to my family and the other that I may give to my brother." The broker does so; and the dealer takes them home and the quality proves satisfactory. Now, this, as I understand, was all that was done in this case. That is what is called a sample. Was there any fraud in the selection of these three cans? Were they taken from the eight hundred cases, not selected expressly with a view to the fair presentment that would be exhibited to the eye when opened, but selected—if I may use the expression here—haphazard—selected by chance. No studied effort to get these three, but picked indiscriminately out of the cases—the eight hundred cases. If they were thus selected, then there was no fraud in the selection. It was fair; and because there was no fraud, and because it was fair, the transaction of the parties is legal. How did the broker know? How did the parties who desired the broker to sell know, if the heads were not bulged, that the corn was not good? There is no fraud where the purchaser has the same means of ascertaining the contents of a thing that the seller has. Both stand exactly upon the same level, upon the same equality. And why should one man, in view of such circumstances, or one party to a transaction have an advantage over that of another in the transaction? This is the reason that leads me to the legal proposition that I have already enunciated. And hence I will say to you that this sale by sample is not in itself a warranty.

"If, to illustrate, there were two lots of this corn of the same brand, or bearing the trade mark or impress of the same maker, one was inferior to the other; or, if you please, of the same grade, I don't care if they were of different lots, the broker was bound, and the principal whom he represented was bound to send, in filling the order of purchase, the balance of the cans from which the samples were taken. He would not be justified in going into the other lot. [Suppose that one lot was inferior to the other, and was known to be such, the selection of a can for a sample from the good lot, and then to fill the contract from the bad, would be fraud; and that would create a liability in such a contingency.]

"I have used this as a mere figure for illustration. [There is no evidence in the case that there were two lots.] I have used it simply for the purpose of illustrating a case where fraud might come in. There is no evidence in the case, that I perceive, of warranty or fraud.

"Well, it is said that there is a custom prevailing amongst dealers in canned fruits, that if the fruit proves defective or of inferior quality, that then the purchaser, by force of that custom, is not bound to pay for it. It may be returned and the money

2 Norris—21

[Boyd *v.* Wilson.]

obtained, or a sound commodity substituted in its place.   Now, in order to make a custom good, it must be reasonable; it must be certain; it must be universal, so far as the given department of business is concerned; and it must be continuous, and so thoroughly established, that every man in the trade, possessing ordinary prudence and intelligence, knows of it.   And if it does not come up to this standard it is not a good custom, and amounts to nothing. [Now this is the definition of a custom that you are to apply to the testimony in this case: If it is positive; certain; continuous; known to all the trade; *uncontradicted*, then it is a good custom, and the defence to this extent would avail.   If it does not come up to this standard, then it fails, and would not amount to a defence. Whether there is a custom, in view of this testimony, you have got to work out yourselves.]   Suppose, therefore, you do find that this is the custom, then you will pass to the consideration of ascertaining from the evidence, as best you can, what proportion of these cans is bad; that you have got to ascertain, because, according to the custom that is alleged here, the plaintiffs are only to take back the bad ones or substitute in their place good ones.   Hence you see the difficulty in discussing this question.   Here are sealed goods, the quality of which cannot be determined until they are opened.   I have no doubt, the regard that men generally have for their reputation as dealers, would compel them, rather than lose a customer, to take back the goods; I have no doubt of that.   But that does not create a legal liability; it is a gratuitous as well as a generous piece of conduct on the part of the dealer, rather than lose a customer.

"[If you find, as I said before, the custom to be a good custom, in view of what I have said, the defendant would be entitled to a rebate, or a deduction, to the extent of the value of the bad cans; and he must show the extent of the defect.   As he undertakes to show they are bad, the evidence, somewhere in the case, must give you a standard of calculation by which you can reach the result or aggregate in dollars and cents."]

In reply to a request to charge the jury " that the verdict should be for the plaintiffs," the court said :—

."[That I decline for this reason : There are two witnesses that testify one against the other.   A witness for the plaintiff said, at the time the broker sold these goods, he stated he would take back the defective cans.   The broker himself takes the witness stand, and he testifies that he made no such representation.   If he did, then, independent of the question of warranty, the plaintiff would be bound to take them back, because it would be an element running right into the contract itself.   It would be in the contract; and hence I cannot affirm this point.   If you find that he did so agree to take them back, he would be bound to take them back.

[Boyd *v.* Wilson.]

If he did not, then he is not bound to take them back, except for the consideration that I have alluded to; that is, the custom."]

The verdict was for the plaintiffs for $2874.32, upon which judgment was entered.

The defendants took this writ and the errors assigned, *inter alia*, were the foregoing portions of the charge in brackets.

*Richard P. White*, for plaintiffs in error.—An analysis of the cases will show that here and in other states, as well as in England, a sale by sample is an engagement upon the part of the vendor to furnish goods corresponding in kind *and in quality* with the sample shown.

In Fraley *v.* Bispham, 10 Barr 320, the case most frequently cited in conflict with this position, it does not appear that there was any evidence of sale by sample, and the real question was whether certain words in a bill of parcel was a warranty of quality, and it was held not to be so, but only of kind. In Carson *v.* Baillee, 7 Harris 375, the vendee bought upon inspection of the bulk, and it was properly held, that after a purchase on inspection, there was no implied warranty in a bill of parcels.

Against these cases we have the current of authority resting on the whole course of commercial usage and on the broad principle, that what a man sells, that he must deliver: Story on Contracts, vol. 2, § 1073, 5th ed.; 1 Parsons on Contracts 584; Chitty on Contracts, 5 Am. ed., 458–463; Bradford *v.* Manly, 13 Mass. 138; Henshaw *v.* Robins, 9 Met. 86; Gallagher *v.* Waring, 9 Wend. 20; Boorman *v.* Jenkins, 12 Id. 566; Leonard *v.* Fowler, 44 N. Y. 289; Merriman *v.* Chapman, 32 Conn. 146; Brantley *v.* Thomas, 22 Texas 270; Moses *v.* Mead, 1 Denio 378; Oneida Manufacturing Society *v.* Lawrence, 4 Cowen 440; Barnard *v.* Kellogg, 10 Wall. 383.

In Pennsylvania also the doctrine has been recognised, despite the doubts raised by Fraley *v.* Bispham, *supra*; Dailey *v.* Green, 3 Harris 125; Maute *v.* Gross, 6 P. F. Smith 250.

What the intent of the parties to such a transaction was is a question for the jury. It meant simply that the vendor agreed to sell and the vendee to buy corn, of which the cans shown were fair samples in every respect. The fact that no questions were asked, no allegations made, only goes to show that both parties perfectly understood that they were dealing on this basis. In acting as they did they simply followed the common usage of trade known and recognised in every commercial community the world over. In Beirne *v.* Dord, 1 Selden 95, and in Hargous *v.* Stone, Id. 73, it was held that the question of sale by sample is for the jury, and that such sale, when made, is an engagement to deliver goods corresponding to the sample.

[Boyd *v.* Wilson.]

*Francis E. Brewster, F. Carroll Brewster, Jr.,* and *F. Carroll Brewster,* for defendants in error.—The Supreme Court of Pennsylvania have adhered to the principles of the common law, and in the absence of an express, will not presume an implied, warranty : Jackson *v.* Wetherill, 7 S. & R. 480 ; M'Farland *v.* Newman, 9 Watts 56 ; Wetherill *v.* Neilson, 8 Harris 448 ; Jennings *v.* Gratz 3 Rawle 169 ; Kirk *v.* Nice, 2 Watts 367 ; Sands *v.* Taylor, 5 Johns. 395 ; Hart *v.* Wright, 17 Wend. 267 ; Seixas *v.* Woods, 2 Caines 48 ; Holden *v.* Dakin, 4 Johns. 421 ; Swett *v.* Colgate, 20 Id. 196 ; Coggs *v.* Bernard, 1 Smith's Leading Cases 294.

Ordinarily, the buyer and seller deal with each other at arm's length ; the relation between them is not confidential ; and it is hardly possible to conceive fraud without actual falsehood or tacit breach of confidence : Eagan *v.* Call, 10 Casey 236 ; Paul *v.* Hadley, 23 Barb. 524 ; Barnett *v.* Stanton, 2 Alabama 181 ; Howell *v.* Cowles, 6 Grattan 393 ; Keates *v.* The Earl of Cadogan, 10 C. B. N. S. 591 ; Note by Hare and Wallace to Chandelor *v.* Lopus, 1 Smith's Lead. Cas. 299.

There is an implied warranty that the article delivered shall correspond in species with the commodity sold, but not of quality. All gradations in quality are at the hazard of the buyer : Fraley *v.* Bispham, 10 Barr 320 ; Carson *v.* Baillie, 7 Harris 378 ; Whitaker *v.* Eastwick, 25 P. F. Smith 229.

A man will not be responsible for selling food which is too stale or unsound to be consumed, unless he warrants it expressly or is aware of its condition, and fraudulently conceals it from the purchaser : Goldrich *v.* Ryan, 3 E. D. Smith 324 ; Hoe *v.* Sanborn, 21 N. Y. 552 ; Winsor *v.* Lombard, 18 Pick. 57 ; Wright *v.* Hart, 18 Wend. 449 ; Moses *v.* Read, 1 Denio 378 ; Hyland *v.* Sherman, 2 E. D. Smith 234 ; Note by Hare and Wallace to Chandelor *v.* Lopus, 1 Smith's Lead. Cas. 299.

The judgment of the Supreme Court was entered, February 5th 1877,

Per Curiam.—If we trace the law of this state through the following cases we shall find that a sale of chattels by the production of a sample, but without fraud or circumstances to fix the character of the sample as a standard of quality, is not attended by any implied warranty of the quality. The sample under such circumstances, pure and simple, becomes a guaranty only that the articles to be delivered shall follow its kind, and be simply merchantable. These are the cases referred to : Borrekins *v.* Bevan, 3 Rawle 23 ; Jennings *v.* Gratz, Id. 169 ; Kirk *v.* Nice, 2 Watts 367 ; McFarland *v.* Newman, 9 Id. 56 ; Fraley *v.* Bispham, 10 Barr 320 ; Carson *et al. v.* Baillie, 7 Harris 378 ; Wetherill *v.* Neilson, 8 Id. 448 ; Eagan *v.*

[Boyd v. Wilson.]

Call, 10 Casey 236 ; Weimer v. Clement, 1 Wright 147 ; Whitaker v. Eastwick, 25 P. F. Smith 229. Such precisely was the state of this case. The broker going on a business round produced a can of the corn and exhibited it to the defendants, and they afterwards asked to see others, which they opened and examined, and proved by cooking for themselves. On the following day they made an offer for the lot, which was accepted. There was no fraud and no warranty of the quality, and no circumstances to show that the parties dealt upon the basis of a quality to be precisely such as the cans exhibited contained. The evidence also showed that such cans are hermetically sealed to preserve the corn and are thus both bought and sold, and that the only true indication of their being spoiled is the bulging of the cans, produced by fermentation, and the consequent evolution of gases, which swell out the head. It was also shown that these cans were not bulged. The court charged if there were fraud in the selection of the cans, as a means of imposition, or they were of a particular lot and the seller delivered from a different lot, it would be evidence of fraud. But the court saw no evidence in the case of either fraud or warranty, and under these circumstances charged that a sale by sample was not in itself a warranty of the quality of the corn. This language is too broad for all cases, but, under these facts, it seems to us there was no error in the instruction. It was said of a general sale without circumstances. The seller did not agree or say that the remainder should be of the same quality as the sample, and the purchaser did not order the corn to be delivered to be of the same quality as the sample. Nothing was said or done on either side to give character to the sample cans as a standard of the quality. This being the nature of the sale, the sample became a standard only of the kind, and that the goods were simply merchantable. So long as the commodity is saleable its different degrees of quality from good to bad are not the subject of an implied warranty. If it be wholly unmarketable, such as cannot be considered merchantable, probably a different conclusion would be reached, because an unmarketable article is substantially different in kind from one that is saleable in the market. In such a case it is not the name merely which governs, but the fact that it is without market value, and cannot reasonably be pronounced of the same kind as the sample. In Jennings v. Gratz, supra, it was held that a moderate degree of adulteration often did not destroy the merchantable character of an article of sale, but the court said: "Adulteration may be carried so far as to destroy the distinctive character of the thing altogether, and in doubtful cases there is perhaps no practical test but that of its being merchantable under the denomination affixed to it by the seller."                                        Judgment affirmed.

SHARSWOOD, J., dissents.

[Boyd *v.* Wilson.]

After the above judgment was entered, the plaintiffs in error petitioned the court for a re-argument, among other reasons therefor assigning the following : That the time allowed for argument (one hour) was too brief ; that the decicion was counter to the prevalent understanding among the bar and business community in regard to the law governing sales by sample ; that many of the heaviest transactions of commerce in the state, with other states, and foreign countries are conducted through the medium of sales by sample, and without other warranty than that which has been universally understood to be implied by an exhibition of a sample of the goods offered for sale ; that sales are thus effected in commercial exchanges, by brokers, travelling · agents, and foreign merchants through agents in this country, and that all the great interests which they represent will be prejudiced, if this decision is allowed to stand.

Further that, even under the rules enunciated by this court, this case ought to be reversed, inasmuch as the evidence was direct, full and uncontradicted that a large portion of the corn was " bad," " unsaleable," " unfit for food" and " unmarketable," and that the good and bad being mixed, rendered the whole unsaleable, there being no means of separating them ; and further, that the court below had given the jury a binding instruction that the plaintiffs in error were bound to keep and pay for the cans proved to have been unfit for food and unmarketable, which, under the opinion in this case, was error.

On the 19th of February 1877, the following additional judgment was entered,

PER CURIAM.—We announced, in this case, the result of a long line of decisions. The motion for a re-argument is simply a demand for a change in the law—for judicial legislation. The law of this state has long been thoroughly settled by its courts, that a sale of chattels without fraud or misrepresentation creates no liability for quality, and that the production of a part of the goods, when not made by the acts or agreements of the parties a standard of the quality, carries with it no implication of a contract of warranty of the quality. Much of the confusion of thought in these cases is engendered by the use of the word " sample," the mind implying, from the *word*, and not the facts of the sale, an intention to make the sample a criterion of quality. When in fact the sample is made the standard of quality, as if the buyer orders goods of the same quality, or the seller engages to deliver them of the same quality, an implication arises. Hence it is always in the power of the buyer to command an article of the same quality. But in the absence of an undertaking for the quality, or of those facts from which it can be assumed, the law leaves the parties just as they were. It never has been the law of this state that a sound price required a sound

article, for the reason that if the quality of an article be the criterion, instead of the bargain or specific intent of both parties, there would be no end to ruinous litigation. Parties are therefore left to their own judgment and diligence, unless there be fraud or deceit practised by the seller. Peace and good order are thereby promoted, and the parties prompted to proper care and diligence, and to make their bargains so that neither will misunderstand his rights. Take this case as an example. Here is an article enclosed in an air-tight can, the quality of which is unknown to both buyer and seller, and can be ascertained only by opening the can, which is destruction. The article is bought and sold in this condition by wholesale and by retail. If the buyer will not risk the contents, he must require a warranty. But then the seller will demand a higher price to compensate him for the entire risk. Now, if the buyer have made no bargain for quality, on what principle of fair dealing shall he have the advantage of both *price* and quality? Had he said to the seller, " You must deliver me corn of the same quality as in these exhibited cans," the latter would have said, " I will do so ; but I must be compensated for this risk, and I require so much more to be added to the price." It is evident, therefore, that the only just rule, in the absence of fraud or deceit, is to suffer the parties to bargain for themselves as to quality ; otherwise, so long as the article is merchantable, the buyer cannot complain of his own remissness. The real secret of these attempts to raise a warranty by implication is that buyers wish to buy as cheaply as they can, and it is only when they find that they have made bad bargains they complain. If they get a superior article for a low price, they will stoutly insist upon standing on their bargains and paying no more, even if the article be worth double the price paid. The truth is, the argument upon the sample is a *petitio principii.* It assumes a bargain when none is intended. It takes the mere word "sample," and refuses to look at the evidence which discloses no intent to warrant the quality, and leaves the buyer to his own judgment and diligence in making his bargain.

It is said that in the present state of the commercial world much of the business is done by travelling agents and through mere samples. True, the business of the world has changed greatly, but this is an argument to be addressed to the legislature, not to us. We declare the law, but do not make it. If the law as we find it does not suit the times let it be changed by those who possess legislative power. If the law of England or other states differs from ours, to them let petition be made to assimilate them. When sifted, the whole argument addressed to us is a petition in favor of change, not declarative of the law.

It is alleged as a reason for a re-argument that some of the cans were proved to be bad, unfit for food. But the plaintiffs in error know full well no such point was taken in the court below. They

[Boyd *v.* Wilson.]

fought the case on the ground of an implied warranty of the whole, because of a sale by sample. No instruction was asked for a verdict for so much as was proved to be not merchantable. It was a battle for all or for nothing. The learned counsel who urges this reason knows well that a court of error does not reverse upon issues not made in the court below.    Re-argument refused.

SHARSWOOD, J., dissents.